**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

| | |
|---|---|
| **JABARI O. EDWARDS** | **PLAINTIFF** |
| **V.** | **NO. 1:25-CV-5-DMB-DAS** |
| **UNITED STATES OF AMERICA** | **DEFENDANT** |

# MEMORANDUM OPINION

After he was arrested, indicted, tried, and acquitted on federal wire fraud and money laundering charges, Jabari O. Edwards brought claims against the United States of America under the Federal Tort Claims Act for malicious prosecution, abuse of process, false arrest, false imprisonment, and intentional and/or negligent infliction of emotional distress. The United States moved to dismiss all Edwards' claims for lack of subject matter jurisdiction and failure to state a claim, arguing that Edwards' allegations regarding false grand jury testimony are barred by absolute immunity, his allegations regarding false statements in a search warrant affidavit have no state court analog, and his remaining allegations fall under the discretionary function exception. Rejecting the absolute immunity and state court analog arguments, the Court denied the motion to dismiss without prejudice only to the extent that it requires further briefing regarding the discretionary function exception.

## I
## Procedural History

On September 3, 2025, Jabari O. Edwards filed a second amended complaint in the United States District Court for the Northern District of Mississippi against the United States of America.[1] Doc. #23. In the second amended complaint, Edwards alleges under the Federal Tort Claims Act

[1] Edwards filed his original complaint January 14, 2025, and filed an amended complaint March 3, 2025. Docs. #1, #3. He filed his second amended complaint with leave of the Court. Doc. #22.

claims for malicious prosecution, abuse of process, false arrest, false imprisonment, and intentional and/or negligent infliction of emotional distress—all arising from his arrest, indictment, and acquittal on federal wire fraud and money laundering charges in connection with Paycheck Protection Program loan funds and Economic Injury Disaster Loan funds. *Id.*

On September 17, 2025, the United States filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. #25.[2] Edwards responded in opposition on October 17, 2025, Doc. #29; and the United States replied on December 15, 2025, Doc. #34.[3] On September 30, 2026, the Court denied the United States' motion to dismiss without prejudice. Doc. #35. This opinion articulates the reasons for that ruling.

## II
## Standard

### A. Rule 12(b)(1)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) asserts a "lack of subject-matter jurisdiction." In evaluating a Rule 12(b)(1) motion, a court may consider the complaint alone, undisputed facts in the record, and the court's resolution of disputed facts. *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). The allegations in the complaint are taken as true in determining whether a sufficient basis for jurisdiction exists. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The burden of establishing jurisdiction rests on the party asserting its existence. *Morris*, 852 F.3d at 419 (citing *Ramming*, 281 F.3d at 161). If subject matter jurisdiction is lacking, the case must be dismissed. *Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011); *accord*

---

[2] The United States' motion does not contain a certificate of service. Under Federal Rule of Civil Procedure 5(d)(1)(B), "[n]o certificate of service is required when a paper is served by filing it with the court's electronic-filing system."

[3] The Court granted Edwards' request for an extension to respond and the United States' request for an extension to reply. Docs. #28, #33.

*Krim v. PcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005).

**B. Rule 12(b)(6)**

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) asserts a "failure to state a claim upon which relief can be granted." To survive dismissal under the Rule 12(b)(6) standard, "a complaint must present enough facts to state a plausible claim to relief. … A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail." *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (quoting *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010)). In analyzing a Rule 12(b)(6) motion, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Serrano v. Customs & Border Patrol*, 975 F.3d 488, 496 (5th Cir. 2020) (per curiam) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)). "However, … 'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (quoting *S. Christian Leadership Conf. v. Sup. Ct. of La.*, 252 F.3d 781, 786 (5th Cir. 2001)).

**III**
**<u>Factual Allegations</u>**

As of 2019, Jabari O. Edwards owned seven active companies ("J5 Companies") in Columbus, Mississippi. Doc. #23 at 2. BH Properties, one of Edwards' companies, was a partner with the City of Columbus as participants in the Mississippi Home Corporation's Blight

Elimination Program ("Columbus Blight Program"). *Id*.

North Atlantic Security ("NAS"), a company owned by Edwards that performed armed and unarmed security for government entities and businesses, applied for a second Paycheck Protection Program ("PPP") loan on January 2021. *Id.* at 9, 11. NAS was approved, and received the loan proceeds approximately two weeks post-application. *Id.* at 9.

NAS also applied for two Economic Injury Disaster Loan ("EIDL") modifications on or about October 20, 2021, and November 9, 2021, respectively. *Id.* NAS was approved for both, and received the loan proceeds from both applications shortly after approval. *Id.* Edwards personally guaranteed repayment of both of NAS's EIDL modifications. *Id.*

Edwards Enterprises ("EE"), another company owned by Edwards, applied for an EIDL and an EIDL modification on or about December 8, 2021, and January 4, 2022, respectively. *Id.* EE was approved for both, and received the loan proceeds from both applications shortly after approval. *Id.* Edwards personally guaranteed repayment of both EE's EIDL and EIDL modification. *Id.*

Beginning in March 2020, Agent Richard Vignogna, a special agent with the Department of the Treasury's Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), targeted an investigation into Edwards. *Id*. at 5–6, 7, 10. During the investigation (or after Edwards was indicted), Vignogna maintained a business connection with a security company named Global Threat Solutions, LLC, a Florida domestic limited-liability company ("GTS Florida") that provides armed and unarmed security for government entities and businesses. *Id.* at 10, 11. NAS, one of the corporate entities investigated by Vignogna, bid for business in jurisdictions where GTS Florida provided and bid to provide the same security services. *Id.* at 11.

After commencing his investigation into the Columbus Blight Program, Vignogna learned

that no irregularities existed in such program. *Id.* at 11, 12. Despite this, for two years Vignogna secretly searched for evidence to arrest Edwards because he felt Edwards could land him the target of his investigation – former Mayor Robert Smith. *Id.* at 11–12. Vignogna represented to the United States Attorney's Office for the Northern District of Mississippi, grand juries in that district, and court officials that Edwards was an employee of the City of Columbus when Edwards was not. *Id.* at 12.

In July 2021, the United States of America, through its federal officers, including Vignogna, convinced the United States Attorney's Office to obtain grand jury subpoenas for seventeen bank accounts covering all of Edwards' personal and business bank accounts.[4] *Id.* at 12. At that time, the United States had received no evidence that any of Edwards' companies were involved in wrongdoing with PPP funds because there had been no interviews of any persons with knowledge; and NAS and EE had not obtained the EIDL and EIDL modification funds at issue. *Id.* at 13. The July 2021 subpoenas yielded no evidence of criminal activity by Edwards. *Id.*

Between November 2021 and June 2022, the United States, through its federal officers, including Vignogna, interviewed several people, including Wanda Holley, a certified public accountant who audited the City of Columbus's financial records; Melanie Cole, a former employee of Edwards' company The Bridge Group; Christina Steadman and James Bell, two former select management employees of NAS; Shannon Cosby, a non-management employee of NAS; and Pat Davidson, NAS's outside accountant. *Id.* at 14–15. Upon learning that certain of Edwards' companies received PPP and EIDL funds, the United States, through its federal officers, including Vignogna and Agent Mauricio Dietrich Bohmer, another SIGTARP special agent,

[4] The subpoenas also sought and obtained records for companies that Edwards did not own or hold any interest in and information on a person with the same name as Edwards (Jabari Edwards) but with whom Edwards had no relationship. Doc. #23 at 12, 13. That person also had no connection to any business with the City of Columbus. *Id.* at 13.

shifted its focus from the Columbus Blight Program to PPP and EIDL funds. *Id.* at 8, 15.

The United States, through its federal officers, including Vignogna and Bohmer, learned that Davidson had provided all the figures for Edwards' second PPP loan applications; Steadman helped prepare the second PPP loan application; Edwards never suggested not paying debts owed by him or his companies; and Edwards told Steadman and Antwaan Richardson, an employee of Edwards' companies (who was later indicted as Edwards' co-defendant), that he did not want to take the second PPP loan if NAS was not entitled to it. *Id.* at 16 & n.10. Steadman's and Bell's interviews disclosed that Edwards was not involved in finances; always cautioned staff to stay within the law; and though he was aware of the second PPP loan application, he was not integrally involved in compiling or completing the application. *Id.* at 17. Bell told federal agents that neither Edwards nor Richardson had done anything wrong; that the sale agreement between American Sentry[5] and NAS did not occur in late December 2020 or January 2021; and that NAS was transitioning into a new business called WECU. *Id.* The United States had the authority to audit the J5 Companies but did not do so. *Id.* at 18.

On June 13, 2022, Vignogna applied for a search warrant by submitting an affidavit to United States Magistrate Judge Roy Percy. *Id.* at 21. The affidavit included numerous false statements, including statements regarding Edwards' relationship with the City of Columbus; the relationship among Edwards' companies; the timing of the sale of NAS; Steadman's knowledge of the PPP loans at the time of the sale of NAS; when Steadman left her position; Edwards' use of PPP and EIDL funds; and whether NAS ceased to do business. *Id.* at 21–28. Vignogna also exaggerated the shortness of the period between funding of the second PPP loan and the sale of NAS's contracts. *Id.* at 26–27.

---

[5] At Edwards' trial, Steadman admitted that she and Bell purchased a shell company, American Sentry, which had been inoperable for years, and used American Sentry as an entity to take over NAS's contracts. Doc. #23 at 16 n.11.

On or about June 15, 2022, the United States, through its officers, including Vignogna, requested that a grand jury indict Edwards and Richardson for PPP and EIDL fraud. *Id*. at 29. Vignogna did not tell the grand jury certain rules applicable to the PPP and EIDL programs, such as the September 8, 2021, Small Business Administration interim rule change regarding use of funds by affiliated companies and payment of federal debts, which became effective prior to NAS and EE applying for and obtaining the EIDL modifications. *Id*. at 29. Vignogna made several false statements to the grand jury, including statements regarding the timing of the sale of NAS and the PPP and EIDL loan applications; Edwards' use of PPP and/or EIDL funds; suspected fraud related to the Columbus Blight Program; Edwards' relationship with the Columbus Blight Program and the City of Columbus; and the rules of the PPP and EIDL programs. *Id*. at 30–39. The United States, through its officers, including Vignogna, did not tell the grand jury that Steadman had written statements explaining that Edwards did not suggest his companies would not pay their debt and was adamant about repaying debts owed by him or his companies; Edwards asked her and Richardson in December 2021 whether they were allowed to file for the PPP loan for NAS since it was to be closed at the end of February 2022 and said he did not want to take the loan if the company was not entitled to it; and she prepared the second PPP loan application. *Id*. at 40–41. The United States, through its federal officers, including Vignogna, did not tell the grand jury that NAS's second PPP loan application was applied for on January 10, 2021, and funded on January 21, 2021; that certain NAS employees continued to be paid well into March 2021; and that Davidson told Vignogna and his team that NAS was still doing business in 2022. *Id*. at 41.

The grand jury returned a thirteen-count indictment on June 15, 2022, charging Edwards with one count of conspiracy to commit wire fraud, three counts of wire fraud, two counts of false statements or representations, and seven counts of money laundering. *Id*. at 42; *United States v.*

*Edwards*, No. 1:22-cr-69, at Doc. #1 (N.D. Miss. June 15, 2022).[6] No charges in the indictment were for wrongdoing in the Columbus Blight Program; and no charges or indictments have ever been brought against Edwards or anyone else related to such program. Doc. #23 at 42.

On June 16, 2022, Edwards was arrested on the charges in the indictment. *Id*. at 43. Vignogna designed Edwards' arrest to get maximum attention and do maximum damage to Edwards. *Id*. Vignogna led a team of law enforcement agents who raided Edwards' corporate offices; blocked the driveway of his home and the street in front, bringing his neighbors outside; caused his personal vehicle to be towed; and handcuffed and arrested him outside for all to see. *Id*. Vignogna alerted the media to draw local and national attention to the raid at Edwards' offices and his arrest. *Id*.

Prior to being transported from his home, Edwards, in the presence of law enforcement, asked his neighbors to call his wife and tell her to call his lawyer. *Id.* After being transported to the FBI office in Columbus, Edwards was interrogated by Vignogna and Bohmer. *Id*. at 44. Prior to the interview commencing, Edwards requested to speak with his attorney but Vignogna and Bohmer told him he could not call his attorney until he signed a waiver of his Miranda rights. *Id*. After Edwards signed the waiver, Vignogna and Bohmer immediately began interrogating him. *Id*. Following the interrogation, Edwards was transported to a Magistrate Judge for a formal hearing and was ultimately released on a $1,000.00 bond. *Id*. at 45.

Less than a month later, Edwards and his counsel met with Vignogna and assistant United States Attorneys. *Id*. During that meeting, Vignogna stated that the indictment filed against Edwards was not about PPP or EIDL loans but about corruption in Columbus and former Mayor Smith; he wanted Edwards to turn over the goods on public officials, particularly Smith; and he

[6] Edwards notes this case in his complaint. Doc. #23 at 55 n.20.

had been investigating Edwards for two years. *Id*. at 45–46. Vignogna made it known that he had deep enmity toward Smith and, in turn, Edwards because of Edwards' affiliation with Smith. *Id.* at 46.

The government took the position that EE received no income in 2019 and Edwards falsified his tax returns for that year. *Id*. Edwards produced to Bohmer and the United States Attorney's Office invoices for services, payments for services, and documentation showing that he reported $464,325.00 in income to the Internal Revenue Service on his 2019 tax return and was taxed on the same. *Id*. After some of this information was produced, Bohmer re-interviewed the owner of RDI Corporation, the company who paid the 2019 income to EE. *Id*. at 47. Although RDI's owner had told federal agents in his June 16, 2022, interview with Bohmer and his May 24, 2023, interview with defense counsel that the payments to EE were for consulting work, RDI's owner claimed during the second interview with Bohmer that the payments to EE were a gift. *Id.*

For the next two years, Edwards worked and prepared to prove he had committed none of the crimes charged against him. *Id*. at 51. On April 5, 2024, after nine days of trial, Edwards was ultimately acquitted on all counts. *Id*.

## IV
## **Analysis**

The United States submitted that Edwards' second amended complaint should be dismissed because (1) "[Edwards] alleges tortious conduct that is not cognizable under the Federal Tort Claims Act because [it] has not waived its sovereign immunity for those claims;" (2) "the conduct challenged by [Edwards], testimony before a grand jury and in a search warrant affidavit, is afforded absolute immunity and has no analog in state law;" and (3) "the remainder of [Edwards'] claims are barred by the discretionary function exception to the Federal Tort Claims Act." Doc. #25.

Edwards responded that "the claims for malicious prosecution, abuse of process, false arrest and false imprisonment are legally cognizable under the law enforcement proviso of the Federal Tort Claims Act;" "the claim for intentional infliction of emotional distress, or alternative claim for negligent infliction of emotional distress, are legally cognizable under the Federal Tort Claims Act and not barred by discretionary function based on the facts alleged in the Second Amended Complaint;" and "the material factual allegations of the Second Amended Complaint, notwithstanding the claim of absolute immunity by the [United States], state claims upon which relief may be afforded." Doc. #29 at PageID 452 (internal citation and emphases omitted).

The United States replied that "[w]hile [Edwards] may allege conduct outside of the grand jury, every state law cause of action leads inevitably to the grand jury, without which there is no cause of action – and that conduct is absolutely immune;" "[t]he act of applying for a search warrant has no analogous counterpart for private citizens and is therefore not reviewable under the FTCA;" "[t]he remainder of [Edwards'] claims against [it] are subject to the discretionary function exception;" "the FTCA does not allow claims against [it] for violations of the Constitution of the United States;" and "[Edwards] cannot circumvent dismissal by arguing that the SIGTARP agents violated federal criminal law." Doc. #34 at PageID 508–09.

"The FTCA waives sovereign immunity and permits suit against the United States for claims sounding in state tort law for money damages."[7] *Cantu Silva v. United States*, 110 F.4th 782, 787 (5th Cir. 2024) (quoting *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010)). "It provides trial courts with jurisdiction over monetary claims against the Government for the

[7] Although the United States is generally excepted from FTCA liability for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," Edwards' claims are cognizable under the FTCA because they are covered by the law enforcement proviso, which specifies that the United States may be liable for "any claim arising … out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h).

negligent or wrongful acts of its employees 'where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Id*. (quoting 28 U.S.C. § 1346(b)(1)). "Courts consider whether the FTCA applies via a Rule 12(b)(1) motion, because whether the government has waived its sovereign immunity goes to the court's subject matter jurisdiction." *Campos v. United States*, 888 F.3d 724, 730 (5th Cir. 2018) (quoting *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016)).

**A. Grand Jury Testimony**

The United States argued that "because [Edwards'] claims are based upon allegedly false grand jury testimony, and because [it] is absolutely immune from any such claims, [Edwards'] FTCA claims … must fail." Doc. #26 at 8.

Edwards responded that "even when testimony is presented to a grand jury, claims for malicious prosecution may be viable regardless of that testimony being entitled to absolute immunity because other evidence revealing perpetuation of the taint by withholding or misdirecting a magistrate or grand jury may be relevant to determining an actionable claim;" "[he] has provided ample factual allegations that Agent Vignogna and other federal agents, regardless of Agent Vignogns's [sic] grand jury testimony, instigated and influenced [his] prosecution … when there was a lack of probable cause for the prosecution, that there were intentional misrepresentations, intentional omissions and/or false testimony and/or statements, and that exculpatory evidence was withheld;" and "Mississippi law permits statements made in the course of judicial proceedings to be used to support claims for malicious prosecution." Doc. #30 at 25, 26 (footnotes omitted).

The United States replied that it agrees "that absolute immunity does not extend to all activity that a witness conducts outside of the grand jury room … and is not making an argument

to the contrary." Doc. #34 at PageID 496.

The United States cited *Rehberg v. Paulk* in arguing that it is absolutely immune from liability for false grand jury testimony. Doc. #26 at 6 (citing 566 U.S. 356, 369 (2012)). In *Rehberg*, the United States Supreme Court held that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony" and "this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." 566 U.S. 356, 369 (2012). As Edwards pointed out, "*Rehberg* dealt with a §1983 claim for malicious prosecution" while "[t]his case is premised on state law claims." Doc. #30 at 21.

The Fifth Circuit does not appear to have addressed whether *Rehberg* applies in FTCA cases, and no Mississippi courts have applied *Rehberg* in addressing violations of Mississippi law. The United States cited two out-of-circuit cases in arguing that other courts have held that *Rehberg* applies in FTCA cases. Doc. #34 at PageID 495–96 (citing *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014), and *Vidro v. United States*, No. 3:11cv1399, 2012 WL 4481719 (D. Conn. Sep. 26, 2012), *aff'd*, 720 F.3d 148 (2d Cir. 2013)). Contrary to the United States' characterization, the district court in *Vidro* noted that "*Rehberg* does not control" in an FTCA case but found "its logic … persuasive" in determining that "witnesses in judicial proceedings are immune from suit" under Connecticut common law. 2012 WL 4481719, at *4–5. On appeal, the Second Circuit cited *Rehberg* in analyzing the policy justifications for protecting grand jury testimony but also did not hold that *Rehberg* applies to FTCA cases. 720 F.3d at 152–53. Rather, the Second Circuit affirmed the district court's ruling based on its determination that "Connecticut courts would extend the state's longstanding and well-established protections of statements made in [judicial] proceedings

to grand jury witness testimony" based in part on such policy justifications. *Id*. And, because *Morales* (the other out-of-circuit case the United States cited), which applies *Rehberg* to a *Bivens* action, not an FTCA case, but cites and inaccurately describes *Vidro*'s holding in doing so,[8] the United States effectively cited no caselaw which supports extending *Rehberg* to FTCA cases.

In an FTCA case, "the Government is entitled to raise any and all defenses that would potentially be available to a private citizen or entity under state law." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 288 (5th Cir. 2012). So, the issue here is whether grand jury testimony is immune under Mississippi law. In *Knotts by Knotts v. Hassell*, the Mississippi Supreme Court held that "no civil action may be based upon perjured testimony" in light of "the absolute privilege that is attached to relevant statements made during the course of judicial proceedings." 659 So. 2d 886, 889, 890 (Miss. 1995). "Mississippi courts consider statements made in connection with judicial proceedings, 'if in any way relevant to the subject matter of the action,' as 'absolutely privileged and immune from attack as *defamation*, even if such statements are made maliciously and with knowledge of their falsehood.'" *Lehman v. Holleman*, 526 F. App'x 346, 348 (5th Cir. 2013) (quoting *McCorkle v. McCorkle,* 811 So. 2d 258, 266 (Miss. Ct. App. 2001)) (emphasis added).

As the United States indicated,[9] Mississippi courts sometimes refer to immunity for statements made in judicial proceedings using broad language not limited to defamation. *See, e.g., Knight v. R.S.*, 315 So. 3d 549, 552, 553 (Miss. Ct. App. 2021) ("the testimony of a witness in a criminal or civil trial cannot be the basis of a civil lawsuit," and "Mississippi cases barring liability

[8] *Morales* cites *Vidro*, 720 F.3d 148, in noting that the Second Circuit has "applied *Rehberg* to actions under … the Federal Tort Claims Act." 752 F.3d at 237. However, as discussed above, *Vidro* did not hold that *Rehberg* applies to FTCA cases but merely addressed the policy justifications from *Rehberg* in determining whether Connecticut courts would reach a similar result.

[9] Doc. #34 at PageID 496.

for statements made in a judicial proceeding are in accord reaching back to the nineteenth century"). However, as Edwards noted, all the cases cited by the United States "dealt with claims for defamation, slander and perjury, not malicious prosecution." Doc. #30 at 26. The United States cited no case in which a Mississippi court has held that grand jury testimony is afforded absolute immunity in a malicious prosecution, abuse of process, false arrest, false imprisonment, or intentional/negligent infliction of emotional distress action, and the Court is not aware of any such case.

Rather, Mississippi courts consider the truth and/or completeness of statements made in such proceedings in non-defamation actions, including malicious prosecution and intentional infliction of emotional distress. *See Gunter v. Reeves*, 21 So. 2d 468, 470 (Miss. 1945) (though allegations in affidavit for search warrant were absolutely privileged as to libel claim, evidence regarding "truth of the charge made by appellee against appellant" was admissible "as to the count for malicious prosecution"); *McCorkle*, 811 So. 2d at 266 (intentional infliction of emotional distress claim based on assertions and allegations published as part of judicial proceedings not barred based on "precedent indicating that the presence of malice prohibits the assertion of judicial privilege") (citing *Hyde Const. Co. v. Koehring Co*., 387 F. Supp. 702, 725–26 (S.D. Miss. 1974)). The Mississippi Court of Appeals has recognized:

> Once an indictment has been returned by a grand jury, the plaintiff in a malicious prosecution action has the burden of producing evidence to establish lack of probable cause. The plaintiff must produce evidence that the return of the indictment resulted from *perjured testimony* or that the grand jury proceedings were otherwise significantly irregular. The plaintiff may show that the indictment was obtained by *failing to make a full and complete statement of facts* to the grand jury or district attorney, by the *withholding of information* by the prosecutor which might have affected the result, or by showing that the indictment was produced by the misconduct of the party seeking indictment.

*Springfield v. Members 1st Cmty. Fed. Credit Union*, 106 So. 3d 826, 830–31 (Miss. Ct. App. 2012) (quoting 54 C.J.S. *Malicious Prosecution* § 48 (2010)) (emphases added).

Accordingly, under Mississippi law, the United States is not absolutely immune from liability for Edwards' claims based on false statements and withholding of information in grand jury proceedings.

**B. Search Warrant Affidavit**

The United States argued that "[Edwards] alleges perjury on behalf of federal agents;" and "because Mississippi law does not allow for civil claims based on alleged false testimony, [Edwards] has failed to show a sufficient state law analog for his FTCA claim" regarding misrepresentations in search warrant affidavits. Doc. #26 at 9.

Edwards responded that "[he] has brought no tort claim for perjury;" but his allegations regarding the search warrant affidavit "illustrate a lack of an honest belief in [his] guilt …, a lack of probable cause, perverted use of process and maliciousness in the actions of Agent Vignogna;" "negate any discretionary function exception;" and "directly support [his] malicious prosecution, abuse of process, false arrest, false imprisonment and intentional and/or negligent infliction of emotional distress [claims]." Doc. #30 at 29.

The United States replied that "[it] is aware that [Edwards] did not file a Federal Tort Claims Act case based on perjury" but "[t]he point here … is that the *underlying conduct* alleged by [Edwards] has no analog in state court" because "[t]he act of applying for a search warrant has no analogous counterpart for private citizens." Doc. #34 at PageID 499, 500.

Though the United States framed its argument as a lack of a state court analog for perjury, Edwards is not bringing a perjury claim or any stand-alone claim for the alleged misrepresentations in the search warrant affidavits. Edwards' allegations regarding misrepresentations in the search warrant affidavits are part of his malicious prosecution and abuse of process claims. Both claims have a state court analog because they are recognized as torts under Mississippi law. *See Pryor v.*

*J.B. Hunt Transport, Inc.*, 432 So. 3d 883, 888 (Miss. 2026) (malicious prosecution); *Henley, Lotterhos & Henley, PLLC v. Bryant*, 361 So. 3d 621, 632 (Miss. 2023) (abuse of process).

That private citizens do not apply for search warrants does not change the fact that Edwards' claims have a state court analog given that his allegations regarding the search warrants are not stand-alone claims but rather support claims which have state court analogs. *See Camacho v. Cannella*, No. EP-12-CV-40-KC, 2012 WL 3719749, at *5 (W.D. Tex. Aug. 27, 2012) (private analog existed for claims of false imprisonment and false arrest supported by allegations of misrepresentations in complaint when plaintiff did "not present a separate claim for misrepresentations in an application for judicial process"); *Al-Dahir v. United States*, No. 08-4502, 2010 WL 3922177, at *3 (E.D. La. Sep. 30, 2010) (rejecting argument that plaintiffs could not bring abuse of process and false imprisonment claims based on application for and execution of search warrant because "while private citizens do not apply for and execute search warrants, they do often provide information to law enforcement personnel applying for search warrants" and "a private citizen could fraudulently obtain permission to enter someone else's residence, for unlawful purposes, based on the knowing submission of false information"); *see also In re FEMA Trailer*, 668 F.3d at 288 ("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy. Inherent differences between the government and a private person cannot be allowed to disrupt this analysis.") (citations omitted).

However, as discussed above, the United States is entitled to assert any defenses that would be available to a private citizen under Mississippi law. Under Mississippi law, the privilege that applies to statements made in judicial proceedings applies to statements made in a search warrant affidavit. *See Gunter*, 21 So. 2d at 470 ("The count for libel was based solely on the allegations

made in the affidavit for the search warrant, and nothing is shown to take that allegation out of the general rule that matter published in … a judicial proceeding, is absolutely privileged."). But, as with statements made in grand jury proceedings, the truth of statements in affidavits may be considered in non-defamation actions. *See Orr v. Morgan*, 230 So. 3d 368, 371, 375 (Miss. Ct. App. 2017) (in malicious prosecution action, "genuine issue of material fact" as to "whether probable cause existed to bring charges against [plaintiff]" when plaintiff claimed defendants "acted maliciously by filing a false statement with police and an affidavit for a[n arrest] warrant"); *Bracey v. Montgomery Cnty.*, No. 2025-CA-00369-COA, 2026 WL 2507323 (Miss. Ct. App. Aug. 25, 2026) (defendant "not entitled to dismissal of [plaintiff's] false arrest/imprisonment claim" when plaintiff "plausibly alleged that the sheriff's department recklessly caused [affiant] to sign an affidavit falsely accusing [plaintiff] of forgery"). So, under Mississippi law, the United States is not absolutely immune from liability for Edwards' claims based on false statements in search warrant affidavits either.

**C. Discretionary Function Exception**

The United States argued that the "conduct of the federal government leading to the grand jury presentation and indictment that [Edwards] alleges was tortious relates to the manner in which the government investigated Edwards" and is subject to the discretionary function exception because "the manner in which SIGTARP agents investigate cases requires 'an element of judgment or choice;'" "the SIGTARP agents' conduct during their investigation of Edwards, the conclusions drawn from the investigation, and the decision to present the results of the investigation to the grand jury, are considered discretionary conduct;" and "[t]he SIGTARP agents' motivation in their investigation [is] not relevant." Doc. #26 at 10, 12–13.

Edwards responded that "the acts of the [United States'] federal agents were not

discretionary" because "[t]here is no discretionary function exception permitting violation of the federal statutes and/or constitutional rights identified in the Second Amended Complaint." Doc. #30 at 16.

The United States replied that although "[Edwards] spends a great deal of time in his brief arguing that because he pled constitutional violations, no discretionary function exception can apply," he "also say[s] that he makes no *Bivens* claim,"[10] and "[t]hese two statements cannot be true at the same time;" and "[n]o federal criminal statute alleged by [Edwards] confers a private right of action." Doc. #34 at PageID 497, 498.

"The discretionary function exception insulates the United States from 'any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion involved be abused.'" *Morris v. United States*, 176 F.4th 355, 366 (5th Cir. 2026) (quoting 28 U.S.C. § 2680(a)). "The discretionary function analysis is governed by a two-part test. First, the action must, of course, be committed to the discretion of a government actor, such that the act 'involves an element of judgment or choice.'" *Id.* (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "Second, the complained-of conduct must be of the kind that the discretionary function exception was designed to shield." *Id.* (quoting *Barron v. United States*, 31 F.4th 347, 349–50 (5th Cir. 2022)) (internal quotation marks omitted). "The critical question in the second part of the test is whether the officer's decision was 'susceptible to policy analysis.'" *Id.* at 366–67 (quoting *Spotts*, 613 F.3d at 572).

As to step one, the United States argued that "[u]nder the Emergency Economic Stabilization Act of 2008, the Special Inspector General is specifically given discretion on the procedures utilized by SIGTARP agents to investigate cases;" and as to step two, "the SIGTARP

[10] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

agents' conduct during their investigation of Edwards, the conclusions drawn from the investigation, and the decision to present the results of the investigation to the grand jury, are considered discretionary conduct," and "[t]he SIGTARP agents' motivation in their investigation are … not relevant." Doc. #26 at 12, 13.

The statute establishing the SIGTARP office provides that "[t]he Special Inspector General shall establish, maintain, and oversee such systems, procedures, and controls as the Special Inspector General considers appropriate to discharge [his] duty;" and "the Special Inspector General shall have the authority to conduct, supervise, and coordinate an audit or investigation of any action taken under this subchapter as the Special Inspector General determines appropriate." 12 U.S.C. § 5231(c)(2), (c)(4)(A). A government agent's decisions regarding investigations generally fall under the discretionary function exception. *See Tsolmon v. United States*, 841 F.3d 378, 383 (5th Cir. 2016) ("'[D]ecisions on when, where, and how to investigate and whether to prosecute' have long been found to be core examples of discretionary conduct for which the United States maintains its immunity.") (quoting *Sutton v. United States*, 819 F.2d 1289, 1294–95 (5th Cir. 1987)); *Campos*, 888 F.3d at 733 ("[T]he thoroughness of an investigation is a central decision for law enforcement officers to make, one that is inherently discretionary."). This is true regardless of the agent's subjective intent in initiating and conducting investigations. *See Spotts*, 613 F.3d at 572 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.") (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).

However, "the discretionary function exception does not apply if the challenged actions in fact violated a federal statute, regulation, or policy." *Campos*, 888 F.3d at 731 (quoting *Spotts*, 613 F.3d at 567). Although the Fifth Circuit has noted in dicta that "we have not hesitated to

conclude that [an] action does not fall within the discretionary function of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution," *Sutton*, 819 F.2d at 1293; "[it] has not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception," *Campos*, 888 F.3d at 235 (quoting *Spotts*, 613 F.3d at 569). "[N]early every circuit to have considered the issue [has] held that 'conduct cannot be discretionary if it violates the Constitution' because 'federal officials do not possess discretion to violate constitutional rights.'"[11] *Xi v. Haugen,* 68 F.4th 824, 838 & n.10 (3d Cir. 2023) (collecting cases indicating that First, Second, Third, Fourth, Eighth, Ninth, and D.C. Circuits have held that unconstitutional conduct cannot be discretionary while Seventh and Eleventh Circuits have held opposite) (quoting *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)).

Throughout his complaint, Edwards alleges federal constitutional, statutory, and policy violations. *See* Doc. #23 at 11, 13 n.8, 44, 47–50 (alleging violations of U.S. Department of the Treasury Office of Inspector General, Policy Directive 810-01 (Feb. 6, 2019); 12 U.S.C. 3409(a)); Fifth and Sixth Amendment right to counsel; and 18 U.S.C. §§ 1623(a), 1001(a), 242, 1512(b)(1) and (c)(2)). However, he seems to suggest that the occurrence of such violations necessarily means that *none* of the agents' actions were discretionary, without explaining why this is the case. The United States did not address the alleged constitutional, statutory, and policy violations except to argue that they may not be the basis of an FTCA claim. While the United States is correct on that point, *see Spotts*, 613 F.3d at 565 n.3 ("[A] plaintiff's FTCA claim must be based on a state-law tort claim and cannot be based on a federal constitutional or statutory claim against the

---

[11] The Supreme Court noted that "[s]ome courts do not apply the exception when law enforcement officers violate the plaintiffs' constitutional rights," *Martin v. United States*, 605 U.S. 395, 414–15 (2025) (citing *Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023)), but did not address whether that was an appropriate standard.

Government.") (citing *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)), its response is not relevant to Edwards' argument. Edwards' claims are for violations of Mississippi tort law, not federal law; but for the reasons explained above, violations of federal law may be relevant in determining whether the discretionary function exception applies.

Given this, the Court determined that further briefing was necessary before it could ultimately determine whether and to what extent any of the constitutional, statutory, and policy violations alleged by Edwards affect the application of the discretionary function exception. Specifically, briefing is needed on the issues of whether unconstitutional conduct may fall within the exception; whether any of the violations raised by Edwards are supported by the allegations in the complaint; and assuming such violations did occur, to what extent the agents' conduct is rendered non-discretionary as a result. For this reason, as to only the United States' discretionary function exception basis for dismissal, the United States' motion to dismiss was denied without prejudice.

**D. Constitutional Claims**

The United States argued that "[it] has not waived its sovereign immunity for constitutional torts under the Federal Tort Claims Act;" and "even if the Court construed the allegations in the Second Amended Complaint as a *Bivens* action against the individual agents (though they are not named defendants), to the extent [Edwards] attempts to state a *Bivens* action, it fails." Doc. #26 at 13, 14. Edwards responded that "[he] has made no *Bivens* claim;" and "[the United States] is liable pursuant to 28 U.S.C 1346(b)(1) for the negligent or wrongful acts or omissions of its employees." Doc. #30 at 35. The United States replied that "[Edwards'] constitutional violation allegations, absent alleging *Bivens*, are irrelevant and not cognizable under the Federal Tort Claims Act;" and "[e]ven if the Court construed the allegations in the Second Amended Complaint as a

*Bivens* action against the individual agents … [Edwards'] attempts, if any, to state a *Bivens* action, fail." Doc. #34 at PageID 498.

Though Edwards alleges constitutional violations throughout his second amended complaint, his only claims are for malicious prosecution, abuse of process, false arrest, false imprisonment, and intentional and/or negligent infliction of emotional distress. Since Edwards made clear in his second amended complaint and in his motion response that he is not bringing a *Bivens* claim, the Court had no need to address the United States' argument that such a claim would fail.

**V**
**<u>Conclusion</u>**

For the reasons above, the United States' motion to dismiss [25] was denied without prejudice. Doc. #35. No later than November 19, 2026, the United States may renew its motion to dismiss only as to the discretionary function exception. If the United States files such motion, Edwards may respond, and the United States may reply, within the time periods specified by Local Rule 7(b)(4). The briefing must address whether conduct that violates the United States Constitution may be covered by the discretionary function exception; whether any of the statutory, constitutional, and policy violations Edwards raises are supported by the allegations in his complaint; and if so, to what extent the agents' conduct is rendered non-discretionary as a result of such violations.

**SO ORDERED**, this 29th day of October, 2026.

**<u>/s/Debra M. Brown</u>**
**UNITED STATES DISTRICT JUDGE**